## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

### COURT FILE NO.: 15-cv-01057-MEH

Edgar Rivera, *on behalf of himself*
*and all others similarly situated,*
      Plaintiff,

v.

Exeter Finance Corp.,
      Defendant.

---

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND APPOINTMENT OF CLASS COUNSEL

---

**THOMPSON CONSUMER LAW GROUP, PLLC**
Russell S. Thompson IV (029098)
David N. McDevitt (030761)
5235 E Southern Ave, D106-618
Mesa, AZ 85206
Telephone:    (602) 388-8898
Facsimile:    (866) 317-2674
rthompson@consumerlawinfo.com
dmcdevitt@consumerlawinfo.com
Attorneys for Plaintiff

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| TABLE OF CONTENTS | | **2** |
| TABLE OF AUTHORITIES | | **3** |
| INTRODUCTION | | **5** |
| RELEVANT BACKGROUND | | **6** |
| I. | ASPECT DIALER | **6** |
| II. | INDICATIONS OF NUMBER REASSIGNMENT | **7** |
| III. | INITIAL EFFORTS TO TEST CLASS THEORY | 8 |
| IV. | ILLUSTRATION OF PUTATIVE CLASS MEMBERS' EXPERIENCES | **9** |
| | A. ███-5812 | **9** |
| | B. ███-6039 | **10** |
| | C. ███-0816 | **11** |
| | D. ███-6616 | **11** |
| | E. ███-9932 | **12** |
| | F. ███-7539 | **13** |
| | G. ███-4324 | **13** |
| | H. ███-9539 | **14** |
| | I. ███-7898 | **14** |
| | J. ███-3892 | **15** |
| V. | SUBPOENA TO AT&T MOBILITY | **15** |
| VI. | IDENTIFYING ADDITIONAL POOLS OF CLASS MEMBERS | **17** |
| VII. | SIZE OF IDENTIFIABLE CLASS | **19** |
| PROPOSED NOTICE PLAN AND TRIAL FORMAT | | **20** |
| RULE 23 ANALYSIS | | **23** |
| I. | RULE 23(a) | **23** |
| | A. Numerosity | **23** |
| | B. Commonality | **24** |
| | C. Typicality | **25** |
| | D. Adequacy | **26** |
| II. | RULE 23(b)(3) | **27** |
| | A. Predominance | **27** |
| | B. Superiority | **30** |
| CONCLUSION | | **32** |

## TABLE OF AUTHORITIES

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)   **27, 30**

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017)   **31**

*Brodsky v. HumanaDental Ins. Co.*, 1:10-CV-03233,
    2016 WL 5476233 (N.D. Ill. Sept. 29, 2016)   **30, 31**

*Cellco Partn. v. Plaza Resorts Inc.*,
    12-81238-CIV, 2013 WL 5436553 (S.D. Fla. Sept. 27, 2013)   **16**

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)   **25**

*CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076 (10th Cir. 2014)   **30**

*Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371 (10th Cir. 2015)   **29**

*Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48 (S.D.N.Y. 1987)   **27**

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)   **24**

*Ginwright v. Exeter Fin. Corp.*,
    Case No. 8:16-cv-00565-TDC, 2016 WL 5867443 (D. Md. Oct. 6, 2016)   **31**

*Glauser v. GroupMe, Inc.*,
    C 11-2584 PJH, 2015 WL 475111 (N.D. Cal. Feb. 4, 2015)   **6**

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014)   **27, 28**

*Johnston v. USAA F.S.B.*,
    12-CV-02486-LTB-KLM, 2014 WL 5439965 (D. Colo. Oct. 27, 2014)   **5**

*Konopca v. Comcast Corp.*,
    CV156044FLWDEA, 2016 WL 1645157 (D.N.J. Apr. 26, 2016)   **12**

*Morris v. Davita Healthcare Partners, Inc.*, 308 F.R.D. 360 (D. Colo. 2015)   **30**

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)   **32**

*Rhodes v. Natl. Collection Sys., Inc.*, 317 F.R.D. 579 (D. Colo. 2016)   **27**

*Roberts v. C.R. Eng., Inc.*,
    No. 2:12-CV-00302-RJS-BCW, 2017 WL 414162 (D. Utah Jan. 31, 2017)   **24-26**

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002)   **26**

*Torres–Vallejo v. Creativexteriors, Inc.*, 15-CV-2832-WJM-CBS,
    2016 WL 7155840 (D. Colo. Nov. 23, 2016) **23, 27-29**

*Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227 (9th Cir.1996)) **30**

*Walker v. Apex Wind Const. LLC*, CIV-14-914-D,
    2015 WL 348778 (W.D. Okla. Jan. 26, 2015) **23**

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*,
    725 F.3d 1213 (10th Cir. 2013) **24**

*Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) **24**

**Rules and other authority**

Fed. R. Civ. P. 23(a) **23**

Fed. R. Civ. P. 23(b) **23, 27, 30, 32**

Fed. R. Civ. P. 23(c) **21, 32**

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
    30 FCC Rcd. 7961 **12**

**Statutes**

47 U.S.C. § 227(b)(1)(A)(iii) **5, 25**

## INTRODUCTION

Plaintiff Edgar Rivera ("Plaintiff") hereby moves the Court to certify a class of individuals against Defendant Exeter Finance Corp. ("Exeter") for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*., at Section 227(b)(1)(A)(iii), defined as follows:

> Individuals in the United States to whom Defendant (1) made more than one call (2) to such individual's cellular telephone number (3) using its Aspect Unified IP 7.1 dialing system (4) in an attempt to reach a prior subscriber of such individual's cellular telephone number.

The TCPA "makes it unlawful to use an automatic telephone dialing system to call any telephone number assigned to a cellular telephone service, except calls made for emergency purposes or made with the prior express consent." *Johnston v. USAA F.S.B.*, 12-CV-02486-LTB-KLM, 2014 WL 5439965, at *2 (D. Colo. Oct. 27, 2014).

Exeter, a Wall Street-backed finance company specializing in subprime auto loans, has flagrantly violated the TCPA by autodialing thousands of individuals across the United States with whom it has *no relationship*—other than the fact that, like Plaintiff, these individuals inherited a cell phone number that previously belonged to one of its customers. Through a relatively simple analysis of its dialing records, Plaintiff has identified tens of thousands of phone numbers that Exeter knew or should have known no longer belonged to its customers. A detailed review of select account histories shows that the putative class members' experiences with Exeter range from annoying and unpleasant to downright painful and harassing.

Plaintiff has already obtained the names and addresses for over 800 consumers who were subjected to the identical conduct, based on the same nucleus of operative facts, and who are entitled to the same relief under the law. These individuals represent a small fraction of the estimated 10,000 individuals to whom Plaintiff will be able to provide individual notice and on

whose behalf he will be able to pursue damages under the TCPA. Plaintiff respectfully requests that the Court certify him and his counsel as representatives of this class.

**RELEVANT BACKGROUND**

## I.   ASPECT DIALER

Between September 17, 2012 and May 9, 2016, Exeter placed ████████ calls to 849,978 unique telephone numbers using its Aspect Unified IP 7.1 dialing system ("the Dialer") in ████████████████████████████████ ████ *See* Declaration of David N. McDevitt in Support of Plaintiff's Motion for Class Certification and Appointment of Class Counsel ("Dec.") at ¶ 7. Exeter has partitioned its database, such that the records for ████████ calls made to ████████ of these numbers are stored in the first database partition, named "██████," while the records for ████████ calls made to ████████ of these numbers are stored in "██████." *Id.* at ¶ 8. As such, the call history for ████████ of these 849,978 numbers are stored across the ██████ and ██████ databases. *Id.* at ¶ 9. The databases ████████████████████████████████. *Id.* at ¶ 10.

Exeter placed these calls in order to service roughly 310,000 accounts. *See* Transcript of March 3, 2016 hearing at 16:24, 94:9-10 (alluding to total number of accounts compared to numbers dialed); Dec. at ¶ 11. In the vast majority of cases, the calls were made using a "predictive" dialing process, whereby the Dialer makes more calls than are agents available and, if a call is answered, routes the call to a live agent. Dec. at ¶ 12.  In rare instances, calls are made using a "Preview" dialing process, whereby a live agent is shown account information before initiating a call. *Id.* at ¶ 13.  Both types of calls are made using the Dialer in ████████. *Id.* at ¶¶ 12-13. Under the TCPA, the critical inquiry is whether the dialing system used to make the call constitutes an automatic telephone dialing system ("ATDS"), and thus, this distinction is irrelevant to the class members' claims. *See Glauser v. GroupMe*, Inc., C 11-2584 PJH, 2015 WL 475111,

at *4 (N.D. Cal. Feb. 4, 2015), *appeal dismissed* (July 30, 2015) ("the relevant inquiry under the TCPA is whether a defendant's equipment has the present capacity to perform autodialing functions, even if those functions were not actually used").

## II.   INDICATIONS OF NUMBER REASSIGNMENT

The Dialer records dozens of pieces of information for every call that it makes, including, but not limited to: (1) ███████████, (2) ████████████████████████ ██, (3) █████████████████████████████████████, (4) ████ █████████████████████████████, and (5) ███████████████████████ ██████████████████████████. Dec. at ¶ 14.



There are several *system dispositions* that can indicate a number dialed is not active, including, but not limited to: ████████████████," ████████" ████████████ and ████ ████ (hereinafter "bad number" system dispositions). *Id*. at ¶ 15. The sheer presence of one of these dispositions is not necessarily relevant. The Dialer occasionally records these system dispositions, even when a number is known to be active, so a high percentage of the numbers in the databases contain one of these results somewhere in their respective call histories. *Id*. at ¶ 16.

When the Dialer records several of these codes in a row, it is a strong indication that there is a real problem with the line. *Id*. at ¶ 17. It may be a temporary matter (i.e., nonpayment by the telephone number's subscriber). *Id*. at ¶ 18. The longer the Dialer receives these responses from the telephone network, the more likely it is that the number has been abandoned by the subscriber. *Id*. at ¶ 19. Even a very long string of consecutive "bad number" system dispositions may not indicate that a number—assuming it is a cell phone number—belongs to class member. *Id*. at ¶ 20. Exeter may not have placed any calls to a new subscriber, either because it has removed the number from the Dialer or because payment by the debtor caused Exeter to stop placing calls. *Id*. At the

same time, even a short *string* of results increases the likelihood that reassignment took place; it may simply be that Exeter was not dialing the number for the entire time that the number was unassigned to a subscriber, thus precluding the recording of a very long string. *Id*. at ¶ 21.

In addition, there are two *agent dispositions* that indicate a number may no longer belong to the customer it was attempting to reach: ███████████████" or "███████████████ ███████████████" (hereinafter "wrong number" agent dispositions). *Id*. at ¶ 22. Like with system dispositions, the presence of one of these agent disposition codes is not necessarily relevant. The code may have been entered by error, based on a customer's false statement, or because Exeter's agent simply believed the number should no longer be dialed. *Id*. at ¶ 23.

## III.    INITIAL EFFORTS TO TEST CLASS THEORY

To identify telephone numbers that have a high likelihood of being associated with class members, Plaintiff cross-referenced a list of numbers from the ████ database that had (1) a string four of more consecutive "bad number" system results, and (2) one or more of the aforementioned "wrong number" agent dispositions, somewhere in its dialing history. *Id*. at ¶¶ 24-25.

The result was a list of 12,695 numbers. *Id*. at ¶ 26. Many of these numbers are assigned to residential lines and others are simply invalid numbers that made their way into the Exeter dialing process (e.g., where an agent ███████████████████████████████ ███████████████████████████████). *Id*. at ¶ 27. Plaintiff ran these 12,695 number through a publicly available commercial database, which—for a fraction of a cent per number—returns (1) whether the number is a valid telephone number, (2) whether the number is a cell phone number, and (3) the telecommunications carrier that provides service for the number. *Id*. at ¶ 28. This search returned 9,889 valid cell phone numbers. *Id*. at ¶ 29.

From this list, Plaintiff obtained Exeter's Shaw collection software notes and audio recordings for 10 of these numbers, in order to review the account histories in detail and confirm that the indications of number reassignment based on a review of the Dialer history were correct.

## IV.    ILLUSTRATION OF PUTATIVE CLASS MEMBERS' EXPERIENCES

### A.    ███████-5812

Exeter called the telephone number, ██████-5812 ("the -5812 number"), through the Dialer in ████████ from 8/19/2014 through 9/8/2015. *See* Exhibit A of Declaration at 1 (cells E2-F2); Exhibit B of Declaration at 1-59; Dec. at ¶¶ 30-33 (describing and authenticating exhibits). Exeter placed these calls in an attempt to reach its customer, ███████████████, who opened an account with it on 12/14/2013. *Id.* at ¶ 34. According to AT&T subscriber information, █████ appears to have obtained the -5812 number through the GoPhone prepaid mobile phone service. *See* Exhibit C at 3. However, by the time Exeter began calling the -5812 number, it had already been reassigned to putative class member, ███████████, who activated the number on 4/23/2014 and was the subscriber of the -5812 number until 10/06/2014. *Id.* at 4.

Within three weeks after Exeter began calling the -5812 number, ███████'s voicemail box ceased answering Exeter's calls. *See* Exhibit B at 3 (rows 78-82). This may, however, indicate that the number was abandoned at that point. *See* fn. 5, *infra* (explaining "███████████" strings in ████████). Less than a week after ████████ had formally abandoned the -5812 number, the Dialer began to receive telephone network responses that the line was not active. Exhibit B at 4-7. Exeter received these "███████████████████" virtually every day until 12/5/2014, when the -5812 number was activated by putative class member, ███████████. *See id.* at 7-20; *see also* Exhibit C at 1 (showing subscriber information); Exhibit A at 1 (cell D5 showing string of "bad number"

system dispositions ending on 12/5/2014). Over the next nine months, Exeter called the -5812 number over 1,200 times. *See* Exhibit B at 20-59 (rows 617-1885).

Exeter finally stopped calling the number after it received a call, on 9/8/2015, from a woman saying that her husband had obtained the number for their daughter and that Exeter was calling the wrong number. *See id.* at 59 (row 1882 showing "███████████" of "███████ ███████"); *see also* Exhibit L of Declaration at Track 1. In the recording of this call, the woman states that she previously provided this information to Exeter. *Id.* While the Dialer history for the -5812 number shows a "wrong number" agent disposition, Exhibit B at 59 (row 1876), Exeter did not produce a recording of the call in discovery. Dec. at ¶ 35.

**B.      ███████-6039**

Exeter called the telephone number, ███████-6039 ("the -6039 number"), with the Dialer in ███████ from 5/10/2015 through 3/18/2016. *See e.g.*, Exhibit A at 1 (cells E6-F6); Exhibit B at 59-94. Exeter placed these calls in an attempt to reach its customer, ███████, who opened an account with it on 3/21/2013. Dec. at ¶ 36. At the time the calls began, the -6039 number was assigned to a pre-paid T-Mobile customer. *See* Exhibit D at 7 (showing "Account Effective Date" and "Account Expiration Date" as 4/16/2015 and 1/12/2016, respectively).[1] On 1/13/2016, the -6039 number was assigned to putative class member, ███████. *See* Exhibit D at 3-7; *see also* Exhibit B at 85. Even though calls to Mr. ███████ were marked "███████ ███████" twice in two days after it began calling him, Exeter continued calling the -6039 number for another two months. *Id.* at 94. The only audio recording Exeter retained from this time frame

---

[1] Notwithstanding the nine-month time frame that T-Mobile gives, this pre-paid customer appears to have abandoned the -6039 number in less than a week after Exeter began calling. *See* Exhibit B at 61 (rows 1923-1925 where system switch disposition changes from string of ███████ to string of "███████ and "███████████████" results).

indicated that the subscriber was not its customer, but the agent did not disposition the call as "wrong number." *See* Track 2; Dec. at ¶ 37. Exeter appears to have ceased calling because payment was received from Ms. ███████ on the same day it made its last call. *Id*. at ¶ 38. While an Exeter representative has noted in the Shaw system that the voicemail box has an individual with a different name, there is no indication that it has attempted to remove the -6039 number from the Dialer. *Id*. at ¶ 39. In other words, should Ms. ███████ default on her payments to Exeter again in the future, calls to the putative class member may resume.

C.   ████████-0816

Exeter called the telephone number, ███████-0816 ("the -0816 number"), with the Dialer in ████████ from 10/29/2013 through 11/27/2015. *See e.g.*, Exhibit A at 2 (cells E35-F35); Exhibit B at 94-102. Exeter placed these calls in an attempt to reach ██████████ or her co-borrower, ███████████, based on an account opened with it on 2/7/2013. Dec. at ¶ 40. Ms. ███████ appears to have abandoned the -0816 number no later than October 12, 2014. *See* Exhibit B at 97; *but see* fn. 5, *infra* (explaining "████████" strings in ██████). It went unassigned until it was obtained by putative class member, █████████████, through MetroPCS in mid-2015. *Id*. at 99 (showing string of 'bad' results ending on May 30, 2015); Dec. at ¶ 41. While Mr. ████████ informed Exeter it had the wrong number several times in the first few weeks that he began receiving calls, in a series of increasingly acrimonious phone calls, Exeter continued calling him, more than 50 times, even after its agents repeatedly promised it would stop. *See* Tracks 3-9.

D.   ████████-6616

Exeter called the telephone number, ███████-6616 ("the -6616 number"), with the Dialer in ████████ from 4/29/2013 through 5/4/2016. *See e.g.*, Exhibit A at 2 (cells E36-F36); Exhibit B at 94-102. Exeter placed these calls in an attempt to reach its customer, ████████████, who

opened an account with it sometime prior to April 2013.  *See* Dec. at ¶ 42.  Ms. ███ held the -

6166 number from 12/17/2007 to 1/15/2015, when her service was disconnected.  Exhibit E at 3.

As to be expected by the cessation of "bad number" system dispositions on the Dialer log, *see*

Exhibit B at 161 (lines 5151-53), the line was activated on 3/21/2016 by a new user, ████.[2]

*See* Exhibit E at 1-3 (information shown in second row of table).

      **E.**    **████-9932**

      Exeter called the telephone number, ████-9932 ("the -9932 number"), with the Dialer

in ████ from 3/23/2014 through 5/12/2015. *See e.g.*, Exhibit A at 2 (cells E39-F39); Exhibit

B at 163-202. Exeter placed these calls in an attempt to reach its customers, ██████

██████, who opened an account with it on 10/19/2013.  Dec. at ¶ 43.  Subscriber information

from Sprint shows that the ██████ abandoned the -9932 number no later than 2/3/2015.  *See*

Exhibit F at 3. The Dialer history shows, however, that the -9932 number was out of service from

12/4/2014 to 5/4/2015. Exhibit B at 176-201.  This is the same date that an iWireless subscriber

and putative class member obtained the -9932 number. Exhibit F at 2. Audio recordings in the

week following this activation date show that a new user obtained the number. *See* Tracks 11-15.

---

[2] While the contact name listed is ██████, an audio recording for this number reflects a call
from 5/02/2016 wherein the recipient announces himself as "███," before stating that Exeter had
the wrong number. *See* Track 10. An Internet search reveals that ██████ was the logistics and
procurement manager for ██████, meaning ███ may have obtained the mobile number for
an employee of ███ named ███ Either ███ as the customary user of the number, or ███
as the formal subscriber, could recover on a TCPA claim. *See Konopca v. Comcast Corp.*,
CV156044FLWDEA, 2016 WL 1645157, at *2 (D.N.J. Apr. 26, 2016) ("the statutory term 'called
party' refers to the 'subscriber, i.e., the consumer assigned the telephone number dialed and billed
for the call, or the non-subscriber customary user of a telephone number included in a family or
business calling plan' ") (quoting *In re Rules and Regulations Implementing the Telephone
Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, ¶ 73).

F.   ███████-7539

Exeter called the telephone number, ███████-7539 ("the -7539 number"), with the Dialer in ███████ from 2/20/2014 through 11/5/2014. *See e.g.*, Exhibit A at 2 (cells E44-F44); Exhibit B at 203-232. Exeter placed these calls in an attempt to reach its customer, ███████, who opened an account with it on 2/13/2014.  Dec. at ¶ 44.  After receiving a string of 75 consecutive ███████████████████████ *see* Exhibit A at (cell B44 showing string count), Exeter began calling an unidentified elderly gentleman who told it, on six different occasions, that it was calling the wrong number and that he had just obtained the -7539 number. *See* Tracks 16-21.

G.   ███████-4324

Exeter called the telephone number, ███████-4324 ("the -4324 number"), with the Dialer in ███████ from 3/22/2015 through 6/28/2015. *See e.g.*, Exhibit A at 2 (cells E45-F45); Exhibit B at 232-241. Exeter placed these calls in an attempt to reach its customer, ███████████, who opened an account with it on 3/19/2014. Dec. at ¶ 45. The Dialer immediately began receiving "network announcements" after it started calling the -4324 number. *See* Exhibit B at 232-33. T-Mobile subscriber information shows that putative class member, ███████ activated the line on 4/21/2015.  *See* Exhibit G at 9.  The Dialer's history shows that, after a month long pause in calling, Exeter placed 4 calls to that went to voicemail on 4/22/2015, *see* Exhibit B at 233 (lines 7442-45), but that "network announcements" resumed the same day, when Ms. ███ deactivated the line, Exhibit G at 9, the day after she obtained it.

These "network announcements" resumed, until 6/22/2015, Exhibit B at 233-40, when an unidentified female Tracfone user and putative class member activated the line. Exhibit G at 15. The calls stopped on 6/28/2015, when she informed Exeter that it had the wrong number and that

she had just obtained the -4324 number.  *See* Track 22.  In the recording, the agent informs the subscriber that she can expect additional calls that day.  *Id.*

**H.  ████-9539**

Exeter called the telephone number, ████-9539 ("the -9539 number"), with the Dialer in ██████ from 1/14/2014 through 3/2/2016. *See e.g*., Exhibit A at 2 (cells E50-F50); Exhibit B at 242-264. Exeter placed these calls in an attempt to reach its customer, ███████████, who opened an account with it on 12/26/2013.  Dec. at ¶ 46. The Dialer began receiving "network announcements" on 8/28/2015, which continued until 11/1/2015, Exhibit B at 247-51, when putative class member, ██████, activated the -9539 number through T-Mobile on 11/2/2015. *See* Exhibit H at 1. While Exeter learned in the first call it made to Mr. ████ that it had the wrong number, *see* Exhibit B at 251 (row 8005), it placed another 435 calls to the -9539 number over the next four months. An audio recording—made manually, and therefore not in the ██████████ ████, Dec. at ¶ 47—confirms that a man inherited Ms. ██████ number.  *See* Track 23.

**I.  ████-7898**

Exeter called the telephone number, ████-7898 ("the -7898 number"), with the Dialer in ██████ from 4/27/2015 through 11/12/2015. *See e.g*., Exhibit A at 2 (cells E51-F51); Exhibit B at 264-277. Exeter placed these calls in an attempt to reach its customer, █████████, who opened an account with it on 2/5/2015.  Dec. at ¶ 48. The Dialer immediately began receiving "network announcements" and continued to call the -7898 number while receiving these responses for a period of over five months. Exhibit B at 264-272. The responses ceased on 10/1/2015, *id*. at 272 (rows 8674-8676), when T-Mobile subscriber and putative class member, █████████, activated the line on that date. Exhibit I at 3.

Mr. ███ obtained the -7898 number for his 12-year old son, with whom Exeter had numerous conversations. *See* Tracks 24-29. Mr. ███ called Exeter to explain the situation, *see* Track 30, but it nonetheless called his child more than 50 times following this conversation. *See* Exhibit B at 275 (rows 8787-8838 showing calls placed after 10/29/2015 conversation); Track 31.

**J.      ███-3892**

Exeter called the telephone number, ███-3892 ("the -3892 number"), with the Dialer in ███ from 6/20/2013 through 11/7/2014. *See e.g.*, Exhibit A at 2 (cells E55-F55); Exhibit B at 277-313. Exeter placed these calls in an attempt to reach its customers, ███████ ███, who opened an account with it on 3/22/2013. Dec. at ¶ 49. The Dialer was receiving "network announcement" messages through 10/30/2014, when the -3892 number was activated by Verizon Wireless subscriber and putative class member, ███. *See* Exhibit B at 312 (rows 9962-63); Exhibit E at 1-2 (in fourth row showing name), 3 (showing "MTN Effective Date"). Exeter finally stopped calling this individual, a non-English speaker, after its agents were able to transfer a call it made to him to a Spanish-speaking representative, in order to confirm that he was not Mr. ███ *See* Tracks 32-36.

## V.      SUBPOENA TO AT&T MOBILITY

After reviewing the Exeter information and subscriber information for these ten numbers, Plaintiff then sought to establish his class theory on a broader scale. Plaintiff served a Rule 45 subpoena on AT&T Mobility, requesting the subscriber information for the 2,028 numbers (from the list of 9,889 numbers from which the original ten numbers were selected) for which AT&T Mobility or Tracfone-ATT was listed as the carrier.

███████████████████████████

Dec. at ¶ 50. Its subscriber information showed that **1,300** of these numbers were activated by one

or more users during the time frame that Exeter was calling the number. *See* Exhibit J; Dec. at ¶¶ 51-55 (describing and authenticating Exhibit J). Of these numbers, 217 were activated by two new subscribers in the time frame Exeter was calling them, while 55 were activated three or more times. *See* Exhibit J.

In total, there were 1,594 unique activation events. Dec. at ¶ 53. In many cases, ███████

███████████████████████████████████████████████████████

██████. *Id*. at ¶ 56. In other cases, ███████████████████████████

██████ *Id*. at ¶ 57. Many of the numbers were ██████████████████████████.

*Id*. at ¶ 58. Excluding these cases, Plaintiff was able to obtain names and addresses for **840** individuals who activated a wireless number that Exeter subsequently called with its Dialer. *Id*. at ¶ 59. These individuals are *necessarily* members of the putative class. The only way Exeter would have been calling these numbers at the time they were activated is in an attempt to reach the prior subscriber. Otherwise, Exeter would not already have the number in their database.

As anticipated by Plaintiff's identification theory, an activation event was much more likely for numbers whose dialing histories contained longer strings of "bad number" system dispositions. *See* Exhibit J. Over 84% of numbers with strings of 150 consecutive "bad" calls had an activation event, compared with only 36% of the numbers with strings of fewer than 10. *Id.*

In addition, nearly 40% of these numbers had an activation event on the same day that a string of "bad number" system dispositions ended. *Id.* Nearly 50% were activated within one day

---

[3] While businesses are not precluded from recovering under the TCPA, *see Cellco Partn. v. Plaza Resorts Inc.*, 12-81238-CIV, 2013 WL 5436553, at *5 (S.D. Fla. Sept. 27, 2013) ("the statute also recognizes that the cause of action can accrue to an entity as opposed to a natural person"), Plaintiff anticipates that they would be less likely to respond to a class action notice in their own name. Plaintiff still proposes to mail notices to these companies, for which there are roughly 100 names and addresses.

of the end of a bad string and over 60% within a week, further supporting Plaintiff's hypothesis that the end dates of these strings would be associated with the activation of the number by a new user (i.e., a putative class member). *Id*.

## VI.   IDENTIFYING ADDITIONAL POOLS OF CLASS MEMBERS

To confirm his original class member identification theory and identify other groups of numbers that are strongly associated with class members—in addition to the 9,889 numbers discussed above—Plaintiff also obtained information from Exeter's Shaw collection system for 90 additional numbers. Plaintiff grouped the numbers into seven categories, based on different criteria (hereafter referred to as Groups A-G).  Dec. at ¶ 60.

Group A numbers, 23 in total, were part of the original list of 9,889 numbers—from which the original ten numbers were obtained–in that they: (1) were found in the ███ database, (2) contained a string of four or more consecutive "bad number" system dispositions, (3) contained a "wrong number" agent disposition, and (4) are assigned to cell phones.  *Id*. at ¶ 61. However, Group A differed in that they had a *shorter* string of "bad number" system dispositions, ranging from four to 28.  *Id*. at ¶ 62; *compare* Exhibit A at 2 (cell B44 showing low string count of 75).

From Plaintiff's analysis of the Shaw account notes for these numbers, ten numbers appeared to be assigned to class members, ten appeared not to be assigned to class members, while three numbers had unclear call histories.[4] Dec. at ¶ 63. This proportion (43.5%) is in line with the results from the AT&T subscriber data analysis.  *See* Exhibit J (showing 36.1% for numbers with a string count below ten).

---

[4] This uncertainty was due, in large part, to the lack of audio recordings, which Exeter represented (questionably, at best) would cost many thousands of dollars to produce. *See* Doc. 87.

Group B numbers contained a high number (i.e., three or more) of "wrong number" agent dispositions, but not strings of "bad number" system dispositions. Dec. at ¶ 64. Four out of five (80%) of these numbers appeared to be assigned to class members. *Id.* at ¶ 65. Group C contained numbers that were frequently dispositioned by agents as ███████████████████ ████████" but *never* dispositioned as "█████████████████████." *Id.* at ¶ 66. Of the four numbers Plaintiff analyzed, none appeared to be associated with class members and it was unclear why the agents were making this disposition. *Id.* at ¶ 67.

Group D and E were numbers located in ████████ that met the same criteria as the 9,889 numbers that Plaintiff identified in ████████ (i.e., "bad number" string plus a "wrong number" agent disposition). *Id.* at ¶ 68. Group D consisted of numbers with large strings (ranging from 125 to 490), while Group E had shorter strings (4 to 17). *Id.* at ¶ 69. Of the seven numbers in Group D, five appeared associated with class members, one did not, and one was unclear. *Id.* at ¶ 70. Of the thirteen numbers in Group E, five appeared to be class members, five did not, while it was unclear for three. *Id.* at ¶ 71. These proportions (71% and 38%) are in line with the results from Plaintiff's analysis of AT&T data. *See* Exhibit J (showing 36.1% for numbers with a string count below ten and 84.2% for strings of 150 or more).

Group F and G were numbers in ████████ that had large strings (75 or more) of the system result, "████████████," as opposed to "bad number" dispositions.[5] Dec. at ¶ 72. The value of 75 was selected based on Plaintiff's observation that Exeter typically placed, at most, six to seven calls per day to any particular number, so that 75 or more consecutive results suggested a period

---

[5] For unknown reasons, the Dialer appears to have recorded certain 'network announcements' for certain numbers as ████████████████ until the transition to ████████ (after which, strings of "████████ became strings of "████████████████," ████████," or ██████████████"), so this analysis only applied to ████████ *See e.g.*, Exhibit B at 3-7.

of at least three to four weeks of calls. *Id*. at ¶ 73. Group F was cross-referenced with the list of numbers containing a "wrong number" agent disposition, while Group G was not. *Id*. at ¶ 74. Of the eleven numbers in Group F that Plaintiff reviewed, eight appeared associated with class members, while three did not, yielding a proportion (72%) similar to that found for Group D. *Id*. at ¶ 75. For the 27 numbers that Plaintiff reviewed in Group G, only four appeared associated with class members, seven did not, and sixteen were unclear. *Id*. at ¶ 76.

## VII.   SIZE OF IDENTIFIABLE CLASS

As described above, sampling of Shaw account histories of the 90 numbers yielded high rates of accuracy for three other groups: (1) numbers that had three or more "wrong number" agent dispositions, notwithstanding the lack of a string of "bad number" system dispositions, (2) numbers in ███ with a "wrong number" agent disposition and a string of "bad number" system dispositions, and (3) numbers in ███ with a "wrong number" agent disposition and a string of "███████" system dispositions.

The criteria for each of these groups—and Plaintiff's original group of 9,889 numbers—includes the presence of a "wrong number" agent disposition somewhere in the number's dialing history. Within Exeter's databases, Plaintiff found ████ unique numbers (1) that Exeter has called more than once using its Aspect dialer in ██████, and (2) where Exeter's agent dispositioned the call as ████████████████ or ███████████████████████ ███████ at some point during the number's dialing history. *Id*. at ¶ 77.

Not all of these numbers will be associated with class members. Plaintiff estimates that only ████ of them are valid cell phone numbers. *Id*. at ¶ 78. Nor does this list attempt to positively identify all numbers associated with individuals who meet the class definition. A reassigned cell phone number may have been called more than once through the Dialer in ███

██████ but never dispositioned by an agent as a "wrong number." But this does create a starting point for determining whether Plaintiff's class notice plan involves *reasonable* efforts to identify class members in order to provide them with individual notice.

As discussed above, 9,889 of these numbers are included in Plaintiff's original group, of which 62% are associated with putative class members. In addition, ████████████ contain 25,581 numbers (out of ████████) that had three or more "wrong number" agent dispositions. *Id.* at ¶ 79.  ████████ contains ████████ numbers that had four or more consecutive "bad number" system dispositions and at least one "wrong number" agent disposition, while it contains ████████ numbers that had 75 or more consecutive ████████████ system dispositions and at least one "wrong number" agent disposition. *Id.* at ¶ 80.

Within these additional three groups, there are ████████ are unique numbers. *Id.* at ¶ 81. After running these numbers through the commercial database, Plaintiff identified 16,089 valid cell phone numbers and their carriers.  *Id.* at ¶ 82.  Combined with the original 9,889 numbers, these additional criteria yield a total of 25,978 valid cell phone numbers that Plaintiff has identified as likely to belong to putative class members. Of these, over 21,500 are held by the four major wireless carriers—AT&T (6,737—including 2,028 for whom Plaintiff has already obtained subscriber information), Verizon (6,003), Sprint (4,517), and T-Mobile (4,262). *See* Exhibit K (showing carriers and their relative proportions for these 25,978 numbers); Dec. at ¶ 83.

### PROPOSED NOTICE PLAN AND TRIAL FORMAT

In addition to standard publication notice, Plaintiff proposes a notice plan for individuals associated with these 25,978 numbers as follows:

1.      Plaintiff will obtain from Exeter the Aspect database through the date of the class certification order and supplement the list of 25,978 numbers with any additional numbers that

meet the above criteria (i.e., those numbers from ███ that have 3 or more "wrong number" agent

dispositions or have at least one "wrong number" agent disposition and four or more consecutive

"bad number" system dispositions), based on additional calls placed after 5/9/2016.[6]

     2.     As was done for the 2,028 numbers on his original list of 9,889 numbers, Plaintiff

will subpoena the currently listed carrier for the subscriber information (i.e., names, addresses, and

activation dates) during the time frame that Exeter was placing calls to these numbers.

     a.     Alternatively, should the Court find that a "reasonable effort" to identify individual

class members, *see* Fed. R. Civ. P. 23(c)(2)(B), entails reviewing all numbers which

have a "wrong number" agent disposition, Plaintiff will obtain the name of the

current carrier for all the estimated ███ cell phone numbers (of the ███

numbers with these dispositions), plus any other new numbers from ███ that

Exeter has dispositioned in this manner since 5/9/2016, and then subpoena those

carriers for the subscriber information.

     b.     In the further alternative, should the Court find that a "reasonable effort" entails

reviewing *all* numbers, Plaintiff will obtain the name of the current carrier for all

849,978 numbers that Exeter called through 5/9/2016, plus any new numbers it

called since then, and then subpoena those carriers for the subscriber information.

     3.     If the carrier responds that it does not have any subscriber history for a particular

number during the time frame Exeter was placing calls, Plaintiff will put the number on a master

---

[6] Because no additional calls are stored in ███ the figures for other two criteria—numbers from ███ with (1) at least one "wrong number" agent disposition *and* (2) either four or more consecutive "bad number" system dispositions *or* 75 or more consecutive "███ system dispositions—should not change.

list and re-serve the four major carriers to determine if they have subscriber information for any of these numbers.

4.      If Plaintiff learns that a number was activated during the relevant time frame, but is unable to obtain a full name and address from the carrier (e.g., for prepaid numbers), Plaintiff will employ a third party commercial vendor to search for any names and addresses associated with the number in an attempt to mail notice to the individual.[7]

5.      For those numbers that Plaintiff obtains a name and an address for, whose activation date coincides with the time frame during which Exeter was placing calls, Plaintiff will mail notice to the individual.

Upon certification of the class, Plaintiff will seek to establish liability for all individuals who meet the class definition—likely through a summary judgment motion—regardless of whether they have been identified by telephone number or name and address. In addition, Plaintiff will pursue damages claims for (1) individuals associated with the 25,978 numbers who are identified as having valid TCPA claims through information obtained from the carrier and the Dialer databases, and (2) individuals who submit claims based on standard publication notice.

If, based on this information, Plaintiff is able to establish damages for an individual for a given period, but unable to identify him or her by name and address, the damages award will be stated as followed: "Judgment is hereby rendered against Exeter and in favor of the subscriber of (telephone number) during (subscriber period) in the amount of (dollar amount awarded per call multiplied by the numbers of calls Exeter made during the applicable time period).

Once liability is established for the class as a whole and damages with respect to the identified class members, Exeter may seek to decertify the class with respect to the issue of

---

[7] See Dec. at ¶ 41, fn. 1 (describing commercial vendor).

damages. Should an individual not identified as a class member come forward following a favorable judgment with respect to liability, the individual will then only need to pursue damages. Should an individual come forward with evidence that they were the subscriber named in the judgment, the individual will then be entitled to judgment in their favor.

## RULE 23 ANALYSIS

"To justify class certification, Plaintiff must first demonstrate that all four prerequisites of Federal Rule of Civil Procedure 23(a) are clearly met." *Torres–Vallejo v. Creativexteriors, Inc.*, 15-CV-2832-WJM-CBS, 2016 WL 7155840, at *3 (D. Colo. Nov. 23, 2016). "These threshold elements consist of the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *Id.* "If Plaintiff establishes that he has met these threshold requirements, he must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b)." *Id.* Because the proposed class meets the criteria of Rule 23(a) and Rule 23(b)(3), the Court should certify this action.

## I.     RULE 23(a)

### A.     Numerosity

The proposed class satisfies the numerosity requirement. Plaintiff has already identified the names and addresses of more than 800 individuals who meet the class definition. Even this subset is sufficient. *See Walker v. Apex Wind Const. LLC*, CIV-14-914-D, 2015 WL 348778, at *7 (W.D. Okla. Jan. 26, 2015) (denying dismissal of class allegations where plaintiff alleged that "hundreds of individuals" belonged to putative class). Having found these hundreds of individuals from a list of 2,028 numbers, Plaintiff anticipates that from the pool of 25,978 numbers he has

identified, he will be able to identify the names and addresses for over 10,000 individuals who meet the class definition. This is more than enough to satisfy numerosity. *See Roberts v. C.R. Eng., Inc.*, No. 2:12-CV-00302-RJS-BCW, 2017 WL 414162, at *37 (D. Utah Jan. 31, 2017) (finding numerosity met where "Plaintiffs contend[ed] the proposed class exceeds 14,708 drivers").

### B.  Commonality

The proposed class satisfies the commonality requirement. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id*.  For a question of law or fact to establish the commonality requirement, "the common contention 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' " *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) (quoting *Dukes*, 131 S.Ct. at 2551).

There are two important common contentions affecting the putative class that satisfy the commonality requirement. There is the common contention that the Dialer constitutes the type of dialing equipment regulated by the TCPA. A finding by the Court that the Dialer is a "predictive" dialer (and therefore, under binding FCC orders, constitutes an "automatic telephone dialing system") will resolve in one stroke a critical element of each putative class member's claims. Moreover, there is the common contention that Exeter's calls to the class members were made without their "prior express consent," because each of them is a subsequent subscriber of a telephone number that was assigned to them after an Exeter customer—or someone else it was

trying to reach, such as a co-signer—abandoned the number. A finding by the Court that calls made to "reassigned numbers" are made without the called party's "prior express consent," will resolve an essential aspect of each class member's claim that Exeter violated the TCPA at § 227(b)(1)(A)(iii).

### C. Typicality

Plaintiff is typical member of the class. Typicality means that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Parties opposing class certification often point to variations in the experience of proposed class members." *Roberts*, 2017 WL 414162 at *43. "Courts, however, have clarified that typicality does not demand exactly identical interests and claims. Rather, typicality depends on the 'same course of events' and 'similar legal arguments to prove the defendant's liability.' " *Id.* (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007)).

Plaintiff's claims—and Exeter's defenses to his claims—are typical of the claims or defenses of the other members of the class. Plaintiff activated a cell phone number ("the -7951 number") obtained through TracFone wireless on October 27, 2014, which Exeter subsequently began calling "in effort to collect a debt allegedly owed by an individual other than Plaintiff." Doc. 30 at ¶ 10; Exhibit M (AT&T subscriber information showing activation date). Discovery has revealed that Exeter began calling the -7951 number in May 2014 in order to reach one of its customers, who later abandoned it. Dec. at ¶ 84. The calls were made using the Dialer, and Exeter continued making the calls even after receiving numerous strings of "bad number" system dispositions over a period of two weeks, which was preceded by a lengthy string of " ███████ "

system dispositions. *Id.* at ¶ 85; Exhibit N (dialer log for -7951 number showing "bad number" system dispositions ceased on 10/27/2014, the date Plaintiff activated the number).

As Plaintiff's TCPA claim is predicated on the same course of events—Exeter's continued autodialing abandoned numbers—and the same legal arguments, he is a typical class member.

### D.    Adequacy

Plaintiff and his counsel are adequate representatives of the putative class. "In the Tenth Circuit, courts often evaluate adequacy by asking two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?' " *Roberts*, 2017 WL 414162 at *43 (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002)).

Neither Plaintiff nor his counsel have any conflicts of interest with the class members. Plaintiff is a consumer with no relationship to the other class members or with Exeter.  Dec. at ¶ 86.  Plaintiff's counsel is a consumer law firm with no known relationship to any other class members and certainly no relationship with Exeter.  *Id.* at ¶ 87.  Plaintiff and his counsel have acted vigorously on behalf of the class and will continue to do so.  *Id.* at ¶ 88.  Plaintiff has actively participated in providing information and documentation in discovery, has been deposed, and frequently corresponds with his counsel regarding the status of this case.  *Id.* at ¶ 89. Plaintiff's counsel has vigorously prosecuted this action, having invested hundreds of hours of its attorneys' time and tens of thousands of dollars in litigation expenses.  *Id.* at ¶ 90.  Counsel has appeared in-person for multiple court hearings and depositions, and has pursued vital discovery by traveling on-site to Exeter's headquarters to conduct a Rule 34 inspection of its electronic records. *Id.* at ¶ 91.  Counsel's knowledge of TCPA-related matters, such as collection practices and data storage

methods related to collection activity, has been critical insofar to Plaintiff's ability to obtain discovery showing that this action is worthy of Rule 23 treatment. *Id*. at ¶ 92.

## II.     RULE 23(b)(3)

A class may be certified if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id*. This is "a nonexhaustive list of factors." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

### A.     Predominance

"Predominance focuses on the question of liability." *Rhodes v. Natl. Collection Sys., Inc.*, 317 F.R.D. 579, 585 (D. Colo. 2016), *reconsideration denied*, 15-CV-02049-REB-STV, 2016 WL 7377125 (D. Colo. Dec. 16, 2016). "[I]f the liability issue is common to the class, common questions are held to predominate over individual questions." *Id*. (quoting *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 114 F.R.D. 48, 52 (S.D.N.Y.1987)). "The Tenth Circuit has observed [] that 'individualized damages issues' do not defeat class certification and '[c]lass-wide proof is not required for all issues....'" *Torres–Vallejo v. Creativexteriors, Inc*., 15-CV-2832-WJM-CBS, 2016 WL 7155840, at *7 (D. Colo. Nov. 23, 2016) (quoting *In re Urethane Antitrust Litig*., 768 F.3d 1245, 1255 (10th Cir. 2014)).

The predominance element is met here, because liability is a common issue affecting the entire class. Exeter's liability to any class member depends on the common questions identified above: whether the Dialer is regulated by the TCPA as a predictive dialer, and whether Exeter is liable for calls made to reassigned cell phone numbers. Plaintiff anticipates that Exeter will argue that individualized questions—regarding the number of violations for which it is liable to each class member—will predominate over these common questions. As explained in *Torres–Vallejo*, the Tenth Circuit has held otherwise. 2016 WL 7155840 at *7.

That case involved a foreign worker's claim that "he and other workers were paid less than the wages to which they were legally entitled," based on (1) a *de facto* wage deduction stemming from "unreimbursed expenses," (2) the defendants' failure to compensate employees "for the time spent loading, unloading, and traveling between the yard and the first and last job site for each day," (3) the performance of work—such as "driving trucks and acting as supervisors or crew leaders"—which required a higher rate of pay than their job title of 'landscaper' entitled them to, and (4) the defendants' failure to implement a Department of Labor's wage increase mandate for over a month after it was implemented. *Id.* at *2. With respect to the de facto wage deduction, the defendants argued that individualized issues predominated, because "each class member w[ould] need to show receipts or other proof" of job-related expenses. *Id.* at *7. They also argued that "each class member would need to demonstrate the days on which they performed any uncompensated work, and the time spent on any tasks outside the landscape laborer job description." *Id.*

Before simply noting that "[t]he Tenth Circuit has observed [] that 'individualized damages issues' do not defeat class certification," *id.* (quoting *In re Urethane Antitrust Litig.*, 768 F.3d at 1255), this Court rejected these 'individualized damages' arguments, concluding that it seemed

likely, if not probable, that the defendants' records could be used "to prove liability or damages on a class-wide basis." *Id*. It found that a company-wide policy of not reimbursing class members for their visa application fees, along with the fixed amount of the fee for any given year, would allow a class-wide determination of both liability and damages. *Id*. Likewise, it determined that damages for "reasonable costs for transportation between Mexico and Colorado . . . may be provable on a classwide basis, by reference to published bus fares, typical and reasonable hotel and meal costs, etc., without need for individualized evidence." *Id*. With respect to undercompensating for hours worked or job performed, it concluded that "[c]lass-wide evidence such as Defendants' records of the days and hours worked by class members may well provide evidence of days worked, distance of any uncompensated travel time, or other common factual matters." *Id*.

Here, establishing individualized damages for each class member on a class-wide basis is even simpler. The law "provides $500 in damages for each TCPA violation." *Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371, 1376 (10th Cir. 2015). Plaintiff has already shown the Court that Exeter's records show each call that it made using the Dialer in ▆▆ ▆▆ Subscriber information shows when the line was activated by a new user. Even without reference to subscriber information, Exeter's records can be used in most cases to determine when a number has been reassigned. *See* Exhibit J (showing the end date of a string of "bad number" system dispositions was associated with the activation of a line for over 62% of numbers). Even in the rare instances where the subscriber information does not accurately reflect when the individual *stopped* using the number, Exeter's records do. *See* fn. 1, *supra* (discussing how "bad number" system dispositions show a more accurate date for when the number was abandoned by a prepaid wireless user). As the Court explained in *Torres–Vallejo*, "while these factual and evidentiary issues may require careful evidentiary submissions from Plaintiff and his proposed class in the future," the need to

calculate damages for each class member does not preclude the finding of predominance. 2016 WL 7155840 at *7.

### B.      Superiority

The class device is the superior method for fairly and efficiently adjudicating the putative class members' claims. Fed. R. Civ. P. 23(b)(3). "[C]lass treatment is routinely recognized as the superior method of adjudicating mass TCPA violations, for the obvious reason that many TCPA plaintiffs are unlikely to pursue their claims on an individual basis." *Brodsky v. HumanaDental Ins. Co.*, 1:10-CV-03233, 2016 WL 5476233, at *12 (N.D. Ill. Sept. 29, 2016).

The superiority element is met when "it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " *CGC Holding Co., LLC v. Broad and Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014) (quoting *Amchem*, 521 U.S. at 615). "Furthermore, 'a class action is the superior method for managing litigation if no realistic alternative exists.' " *Morris v. Davita Healthcare Partners, Inc.*, 308 F.R.D. 360, 375 (D. Colo. 2015) (quoting *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir.1996)).

A class action on behalf of subscribers of reassigned numbers—certified in this forum—is the most efficient way to obtain relief for the individuals affected by Exeter's conduct. The parties and the Court have already expended substantial time and resources to litigate many of the critical issues and conduct extensive discovery, which will now enable Plaintiff to vindicate the class members' claims. The alternative to the class vehicle is having thousands of individuals file their own suits, which is undesirable from a judicial economy standpoint and risks leading to inconsistent verdicts on central issues.

Moreover, it is simply not realistic to expect each consumer to file his or her own individual claim. Even though thousands of individuals with reassigned numbers have been affected by

Exeter's unwanted and intrusive dialing practices, Plaintiff is not aware of any other class members who have brought suit.[8]  Dec. at ¶ 93.  The factual underpinnings of the putative class members' claims make them difficult to discover and even costlier and riskier to prosecute.  As shown by the audio recordings that it produced, Exeter does not announce its identity, but rather seeks first to establish that it is speaking to the correct party.  While this may serve the privacy interests of the customer who it intended to reach, it means that the vast majority of class members are likely unaware who has called them, let alone realize that federal law protects their right not to be called in this manner.  Most consumers are unlikely to take the time to investigate who placed the call, discover their legal remedy, and then proceed to file a lawsuit.  In fact, many of them simply change their telephone numbers.

Plaintiff anticipates that Exeter will argue that a class action will be unmanageable, because identifying class members and litigating their claims will be administratively difficult.  The evidence before the Court shows that these difficulties are not so great.  "Resolving these claims via class treatment is superior to not addressing the claims at all because of potential administrative difficulties."  *Brodsky*, 2016 WL 5476233 at *12.  Exeter will also likely argue that the class should not be certified, because some class members will never be identified.  The fact that all class members will not receive individual notice does not prohibit certification.  "[T]he Due Process Clause does not require actual, individual notice in all cases."  *Briseno v. ConAgra Foods, Inc.*,

---

[8] Plaintiff is aware of only three other open TCPA suits against Exeter; none involve subscribers of reassigned numbers.  Dec. at ¶¶ 94-97.  One is a putative class action, filed several months after this case.  *Ginwright v. Exeter Fin. Corp.*, Case No. 8:16-cv-00565-TDC, 2016 WL 5867443 (D. Md. Oct. 6, 2016).  The complaint defines the class as "[a]ll persons within the United States who, within the four years preceding the date of filing this Complaint 1) received a nonemergency telephone call from Exeter 2) to a cellular telephone 3) through the use of an automatic telephone dialing system." Dkt. #1. The plaintiff has not moved for class certification, so it is unclear whether he will seek to certify a narrower, more manageable class or, in the alternative, how he intends to address the issue of consent for the hundreds of thousands of consumers he seeks to represent.

844 F.3d 1121, 1129 (9th Cir. 2017). Rule 23 explicitly contemplates actions proceeding under

without individual notice to all class members.  *See* Fed. R. Civ. P. 23(c)(2)(B) (only requiring

"individual notice to all members who can be identified through reasonable effort").  Unidentified

class members will still have liability, and in some cases, damages, established.  Proceeding on a

class action in this manner will not be unfair to Exeter. As the Seventh Circuit recently explained,

district courts should "not to let a quest for perfect treatment of one issue become a reason to deny

class certification and with it the hope of any effective relief at all." *Mullins v. Direct Digital, LLC*,

795 F.3d 654, 662 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161 (2016).

## CONCLUSION

Exeter has violated the TCPA with respect to thousands of individuals for placing

unwanted autodialed calls to them.  Plaintiff has already located several hundreds of them by name

and address and has presented convincing evidence that he will be able to locate several thousand

additional individuals. Liability for the class members may be established based on common

evidence, and even individual damages may be readily calculated based on information obtained

on a class-wide basis. The Court should certify the proposed class under Rule 23(b)(3) and appoint

Plaintiff and his counsel as its representatives.

Respectfully submitted on February 17, 2017,

/s/ Russell S. Thompson IV
Russell S. Thompson IV (029098)
David N. McDevitt (030761)
Thompson Consumer Law Group, PLLC
5235 E Southern Ave, D106-618
Mesa, AZ 85206
Telephone:    (602) 388-8898
Facsimile:    (866) 317-2674
rthompson@consumerlawinfo.com
dmcdevitt@consumerlawinfo.com
Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 17, 2017, I filed the foregoing document using the Court's ECF system, serving a copy on all counsel of record, as follows:

John R. Chiles
BURR & FORMAN LLP
Las Olas Centre II
350 East Las Olas Blvd
Suite 1420
Ft. Lauderdale, FL 33301
Telephone: (954) 414-6200
Facsimile: (954) 414-6201
jchiles@burr.com

Chris Suedekum
BURR & FORMAN LLP
Nashville City Center
511 Union Street, Suite 2300
Nashville, TN 37219
Telephone: (615) 724-3256
Facsimile: (615) 724-3316
csuedekum@burr.com

Austin E. Smith
1700 Lincoln Street, Suite 4650
Denver, CO 80203
Telephone: (303) 764-6800
Facsimile: (303) 831-9243
Austin.smith@olgetreedeakins.com

/s/ David N. McDevitt
David N. McDevitt